# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE MIDDLE DISTRICT OF NORTH CAROLINA
### DURHAM DIVISION

IN RE:

**BERNICE SELLERS HARRIS**                              **08-81715**
                                                        **CHAPTER 13**

## MOTION FOR RELIEF FROM THE AUTOMATIC
## STAY OF SECTION 362
## OR IN THE ALTERNATIVE ADEQUATE PROTECTION


      **COMES NOW** American Home Mortgage Servicing, Inc. Servicer for HSBC Bank USA, National Association, as Trustee for ACE Securities Corp. Home Equity Loan Trust, Series 2006-OP1, Asset Backed Pass-Through Certificates ("American Home Mortgage Servicing, Inc.") and respectfully shows the Court the following:

    1.  On November 10, 2008, the Debtor, Bernice Sellers Harris, filed a petition with the Bankruptcy Court for the Middle District of North Carolina under Chapter 13 of Title 11 of the United States Code.

    2.  On the date the petition was filed, the Debtor was the owner of real property with an address of 2215 East Indiana Ave, Southern Pines, NC 28387 ("Property") and more particularly described in the Deed of Trust referred to below.

    3.  The Property is subject to the first lien of the Movant by Deed of Trust recorded in the Moore County Public Registry, ("Deed of Trust"), a copy of which is attached as "Exhibit 1".

    4.  The said Deed of Trust secures a Note in favor of Option One Mortgage Corporation, in the original principal amount of $115,360.00, dated February 3, 2006 ("Note"), a copy of which is attached as "Exhibit 2".

    5.  The said Note and Deed of Trust have been transferred and assigned to HSBC Bank USA, National Association, as Trustee for ACE Securities Corp. Home Equity Loan Trust, Series 2006-OP1, Asset Backed Pass-Through Certificates.

    6.  Pursuant to the plan, the Debtor was to continue paying the current mortgage payments to American Home Mortgage Servicing, Inc. outside of the plan.

    7.  The Debtor has defaulted in the payment of the mortgage payments to be made outside of the plan, and is now due for the December 1, 2010 through March 1, 2011 payments for a total delinquency of $3,640.73, exclusive of attorney fees and costs.

    8.  The approximate payoff is $126,090.97.

    9.  The scheduled value of the subject property is $154,574.00.

10. Because the Debtor has failed to keep her payments current, as required, American Home Mortgage Servicing, Inc., is entitled to relief from the Automatic Stay pursuant to Section 362(d)(1) of the Bankruptcy Code for cause shown including, but not limited to, lack of adequate protection.

11. This motion shall serve as notice to the Debtor that the movant will collect reasonable attorney fees and costs as allowed by the Note and Deed of Trust.

**WHEREFORE,** American Home Mortgage Servicing, Inc. prays the Court as follows:

1. Modify the Automatic Stay of Section 362(a) of the Bankruptcy Code to permit American Home Mortgage Servicing, Inc. to enforce its security interest in the real property of the Debtor.

2. As an alternative to the relief prayed for above, grant adequate protection to American Home Mortgage Servicing, Inc. for its interest in the property of the Debtor.

3. Modify Rule 4001(a)(3) of the Bankruptcy Code so that it is not applicable in this case and so American Home Mortgage Servicing, Inc. may immediately enforce and implement this order granting relief from the automatic stay.

4. Grant American Home Mortgage Servicing, Inc. reasonable costs and attorney fees incurred in connection with this proceeding; and,

5. Grant American Home Mortgage Servicing, Inc. such other and further relief as may seem just and proper.

6. The Movant further seeks relief to contact the Debtor by telephone or written correspondence and, and at its option, offer, provide and enter into any potential forbearance agreement, loan modification, refinance agreement or other loan workout or loss mitigation agreement.

7. The Movant further requests that this Court require the Debtor to obtain court approval of any future agreements or modifications which increase or reduce the Debtor's disposable income and/or which affect the ability of the Debtor to perform under the Chapter 13 Plan.

This the 22nd day of March, 2011.

*s/ Tamara R. Cornish*
Tamara R. Cornish
N.C. State Bar No.: 39108
Attorney for Creditor
10130 Perimeter Parkway, Suite 400
Charlotte, NC 28216
704/333-8107

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE MIDDLE DISTRICT OF NORTH CAROLINA
## DURHAM DIVISION

IN RE:

**BERNICE SELLERS HARRIS**                     **08-81715**
                                                **CHAPTER 13**

### CERTIFICATE OF SERVICE

I hereby certify that I have this day served the foregoing and annexed pleading or paper upon:
(Served via U.S. Mail)
Bernice Sellers Harris
2215 East Indiana Ave
Southern Pines, NC 28387

(Served via Electronic Notification Only)
John T. Orcutt
6616-203 Six Forks Road
Raleigh, NC 27615

(Served via Electronic Notification Only)
Richard M. Hutson, II
302 East Pettigrew St., Suite B-140
P.O. Box 3613
Durham, NC 27702

by depositing the same in a postpaid wrapper properly addressed to each such party or his attorney of record in a post office or other official depository under the exclusive care and custody of the United States Postal Service and/or by electronic mail, if applicable.

This the 22nd day of March, 2011.

_s/ Tamara R. Cornish_
Tamara R. Cornish
N.C. State Bar No.: 39108
SHAPIRO & INGLE, L.L.P.
10130 Perimeter Parkway, Suite 400
Charlotte, NC 28216
704/333-8107

07-92689

# Payment History Spreadsheet

Generated on 03/22/2011 @ 2:04:13 PM

| Debtors | BK Case # | BK Filing Date | First Post Petition Due For |
|---|---|---|---|
| Bernice Sellers Harris | 08-81715 | 11/10/08 | 11/1/2008 |

| Plan Month | Payment Amount Due | Date Applied | Amount Paid | Post Petition Payment Applied |
|---|---|---|---|---|
| November-08 | 967.27 | 11/17/2008 | 967.27 | 11/1/2008 |
| December-08 | 967.27 | 12/15/2008 | 967.27 | 12/1/2008 |
| January-09 | 967.27 | 1/21/2009 | 967.27 | 1/1/2009 |
| February-09 | 967.27 | 2/23/2009 | 967.70 | 2/1/2009 |
| March-09 | 954.36 | | | |
| April-09 | 977.16 | 4/3/2009 | 954.36 | 3/1/2009 |
| May-09 | 977.16 | 5/19/2009 | 967.27 | 4/1/2009 |
| June-09 | 977.16 | 6/19/2009 | 977.16 | 5/1/2009 |
| July-09 | 977.16 | 7/6/2009 | | NSF $967.27 |
| | | 7/20/2009 | 967.27 | 6/1/2009 |
| August-09 | 977.16 | 8/6/2009 | 967.27 | 7/1/2009 |
| September-09 | 977.16 | 9/3/2009 | 954.36 | To Suspense |
| | | 9/21/2009 | 954.36 | 8/1/2009 |
| October-09 | 1,016.38 | 10/19/2009 | 954.36 | 9/1/2009 |
| November-09 | 1,012.22 | 11/23/2009 | 954.36 | 10/1/2009 |
| December-09 | 1,012.22 | | | |
| January-10 | 1,012.22 | 1/6/2010 | 954.36 | 11/1/2009 |
| | | 1/30/2010 | 2,024.44 | 12/1/2009-1/1/2010 |
| February-10 | 1,012.22 | 2/19/2010 | 1,012.22 | 2/1/2010 |
| March-10 | 1,012.22 | | | |
| April-10 | 954.81 | | | |
| May-10 | 954.81 | 5/10/2010 | 954.36 | To Suspense |
| June-10 | 954.81 | 6/24/2010 | 954.36 | 3/1/2010 |
| July-10 | 954.81 | | | |
| August-10 | 954.81 | 8/9/2010 | 954.36 | 4/1/2010 |
| September-10 | 954.81 | 9/7/2010 | 954.36 | 5/1/2010 |
| October-10 | 1,033.73 | | | |
| November-10 | 1,033.73 | 11/4/2010 | | NSF $1033.73 |
| December-10 | 1,033.73 | 12/6/2010 | 954.36 | 6/1/2010 |
| January-11 | 1,033.73 | 1/10/2011 | 1,000.00 | 7/1/2010-8/1/2010 |
| | | 11/18/2011 | 1,033.73 | 9/1/2010 |
| February-11 | 1,033.73 | 2/14/2011 | 2,660.00 | 10/1/2010-11/01/2010 |
| | | 2/14/2011 | | NSF $1034.00 |
| | | 2/15/2011 | | NSF $1034.00 |
| March-11 | 1,033.73 | | | |

## Payment History Spreadsheet

**Generated on 03/22/2011 @ 2:04:13 PM**

| Debtors | BK Case # | BK Filing Date | First Post Petition Due For |
|---|---|---|---|
| Bernice Sellers Harris | 08-81715 | 11/10/08 | 11/1/2008 |

| Plan Month | Payment Amount Due | Date Applied | Amount Paid | Post Petition Payment Applied |
|---|---|---|---|---|
| November-08 | 967.27 | 11/17/2008 | 967.27 | 11/1/2008 |

| | Total Payments Due | Total Paid | Delinquency in Payments | Post Petition Payment Due |
|---|---|---|---|---|
| | 28695.12 | 25976.83 | -2718.29 | 12/1/2010 |

**TRUE CERTIFIED COPY**
Date _2/6/06_
By_____

Judy D. Martin - Register of Deeds
File Date ___2-6-06___
Time ___1:56___
Book _2970_ Page _200_

WHEN RECORDED MAIL TO:
OPTION ONE MORTGAGE CORPORATION
P.O. BOX 57096
IRVINE, CA 92619-7096

ATTN:  RECORDS MANAGEMENT

LEGAL / SECURITY INSTRUMENT



CERTIFIED TO BE A TRUE AND CORRECT COPY OF THE ORIGINAL

Prepared By: Susan M. Lynch _[Space Above This Line For Recording Data]_

# DEED OF TRUST

THIS DEED OF TRUST ("Security Instrument") is made on        February 03, 2006                . The grantor is
~~HOSIES~~ MCDUFFIE AND BERNICE HARRIS, Single
HOSSIES    Single

("Borrower"). The trustee is
    FIRST AMERICAN TITLE INSURANCE COMPANY
("Trustee"). The beneficiary is
        Option One Mortgage Corporation, a California Corporation                    ,
which is organized and existing under the laws of       CALIFORNIA                  , and whose address is
        3 Ada, Irvine, CA  92618
("Lender"). Borrower owes Lender the principal sum of
    ONE HUNDRED FIFTEEN THOUSAND THREE HUNDRED SIXTY
                    . . .AND NO/100THs            Dollars (U.S.  $115,360.00        ).
This debt is evidenced by Borrower's note dated the same date as this Security Instrument ("Note"), which provides for monthly
payments, with the full debt, if not paid earlier, due and payable on       March 01, 2036            . This Security
Instrument secures to Lender: (a) the repayment of the debt evidenced by the Note, with interest, and all renewals, extensions and
modifications of the Note; (b) the payment of all other sums, with interest, advanced under paragraph 7 to protect the security of
this Security Instrument; and (c) the performance of Borrower's covenants and agreements under this Security Instrument and the
Note. For this purpose, Borrower irrevocably grants and conveys to Trustee and Trustee's successors and assigns, in trust, with
power of sale, the following described property located in         Moore                County, North Carolina:

CERTIFIED TO BE A TRUE AND CORRECT COPY OF THE ORIGINAL

NORTH CAROLINA - Single Family
Page 1 of 8

CERTIFIED TO BE A TRUE AND CORRECT COPY OF THE ORIGINAL

NCD10011.wp (07-19-02)

SEE LEGAL DESCRIPTION ATTACHED HERETO AND MADE A PART THEREOF.

which has the address of            2215 E INDIANA AVE                           ,
                                      (Street)

                SOUTHERN PINES            , North Carolina            28387-7407           ("Property Address");
                   (City)                                                     (Zip Code)

TO HAVE AND TO HOLD this property unto Trustee and Trustee's successors and assigns, forever, together with all the improvements now or hereafter erected on the property, and all easements, appurtenances, and fixtures now or hereafter a part of the property. All replacements and additions shall also be covered by this Security Instrument. All of the foregoing is referred to in this Security Instrument as the "Property."

BORROWER COVENANTS that Borrower is lawfully seised of the estate hereby conveyed and has the right to grant and convey the Property and that the Property is unencumbered, except for encumbrances of record. Borrower warrants and will defend generally the title to the Property against all claims and demands, subject to any encumbrances of record.

COVENANTS. Borrower and Lender covenant and agree as follows:

**1. Payment of Principal and Interest; Prepayment and Late Charges.** Borrower shall promptly pay when due the principal of and interest on the debt evidenced by the Note and any prepayment and late charges due under the Note.

**2. Funds for Taxes and Insurance.** Subject to applicable law or to a written waiver by Lender, Borrower shall pay to Lender on the day monthly payments are due under the Note, until the Note is paid in full, a sum ("Funds") for: (a) yearly taxes and assessments which may attain priority over this Security Instrument as a lien on the Property; (b) yearly leasehold payments or ground rents on the Property, if any; (c) yearly hazard or property insurance premiums; (d) yearly flood insurance premiums, if any; (e) yearly mortgage insurance premiums, if any; and (f) any sums payable by Borrower to Lender, in accordance with the provisions of paragraph 8, in lieu of the payment of mortgage insurance premiums. These items are called "Escrow Items." Lender may, at any time, collect and hold Funds in an amount not to exceed the maximum amount a Lender for a federally related mortgage loan may require for Borrower's escrow account under the federal Real Estate Settlement Procedures Act of 1974 as amended from time to time, 12 U.S.C. § 2601 *et seq.* ("RESPA"), unless another law that applies to the Funds sets a lesser amount. If so, Lender may, at any time, collect and hold Funds in an amount not to exceed the lesser amount. Lender may estimate the amount of Funds due on the basis of current data and reasonable estimates of expenditures of future Escrow Items or otherwise in accordance with applicable law.

The Funds shall be held in an institution whose deposits are insured by a federal agency, instrumentality, or entity (including Lender, if Lender is such an institution) or in any Federal Home Loan Bank. Lender shall apply the Funds to pay the Escrow Items. Lender may not charge Borrower for holding and applying the Funds, annually analyzing the escrow account, or verifying the Escrow Items, unless Lender pays Borrower interest on the Funds and applicable law permits Lender to make such a charge. However, Lender may require Borrower to pay a one-time charge for an independent real estate tax reporting service used by Lender in connection with this loan, unless applicable law provides otherwise. Unless an agreement is made or applicable law requires interest to be paid, Lender shall not be required to pay Borrower any interest or earnings on the Funds. Borrower and Lender may agree in writing, however, that interest shall be paid on the Funds. Lender shall give to Borrower, without charge, an annual accounting of the Funds, showing credits and debits to the Funds and the purpose for which each debit to the Funds was made. The Funds are pledged as additional security for all sums secured by this Security Instrument.

If the Funds held by Lender exceed the amounts permitted to be held by applicable law, Lender shall account to Borrower for the excess Funds in accordance with the requirements of applicable law. If the amount of the Funds held by Lender at any time is not sufficient to pay the Escrow Items when due, Lender may so notify Borrower in writing, and, in such case Borrower shall pay to Lender the amount necessary to make up the deficiency. Borrower shall make up the deficiency in no more than twelve monthly payments, at Lender's sole discretion.

Case 08-81715     Doc 26     Filed 03/22/11     Page 7 of 32

Date: 02/03/06

Upon payment in full of all sums secured by this Security Instrument, Lender shall promptly refund to Borrower any Funds held by Lender. If, under paragraph 21, Lender shall acquire or sell the Property, Lender, prior to the acquisition or sale of the Property, shall apply any Funds held by Lender at the time of acquisition or sale as a credit against the sums secured by this Security Instrument.

**3. Application of Payments.** Unless applicable law provides otherwise, all payments received by Lender under paragraphs 1 and 2 shall be applied: first, to any prepayment charges due under the Note; second, to amounts payable under paragraph 2; third, to interest due; fourth, to principal due; and last, to any late charges due under the Note.

**4. Charges; Liens.** Borrower shall pay all taxes, assessments, charges, fines and impositions attributable to the Property which may attain priority over this Security Instrument, and leasehold payments or ground rents, if any. Borrower shall pay these obligations in the manner provided in paragraph 2, or if not paid in that manner, Borrower shall pay them on time directly to the person owed payment. Borrower shall promptly furnish to Lender all notices of amounts to be paid under this paragraph. If Borrower makes these payments directly, Borrower shall promptly furnish to Lender receipts evidencing the payments.

Borrower shall promptly discharge any lien which has priority over this Security Instrument unless Borrower: (a) agrees in writing to the payment of the obligation secured by the lien in a manner acceptable to Lender; (b) contests in good faith the lien by, or defends against enforcement of the lien in, legal proceedings which in the Lender's opinion operate to prevent the enforcement of the lien; or (c) secures from the holder of the lien an agreement satisfactory to Lender subordinating the lien to this Security Instrument. If Lender determines that any part of the Property is subject to a lien which may attain priority over this Security Instrument, Lender may give Borrower a notice identifying the lien. Borrower shall satisfy the lien or take one or more of the actions set forth above within 10 days of the giving of notice.

**5. Hazard or Property Insurance.** Borrower shall keep the improvements now existing or hereafter erected on the Property insured against loss by fire, hazards included within the term "extended coverage" and any other hazards, including floods or flooding, for which Lender requires insurance. This insurance shall be maintained in the amounts and for the periods that Lender requires. The insurance carrier providing the insurance shall be chosen by Borrower subject to Lender's approval which shall not be unreasonably withheld. If Borrower fails to maintain coverage described above, Lender may, at Lender's option, obtain coverage to protect Lender's rights in the Property in accordance with paragraph 7.

All insurance policies and renewals shall be acceptable to Lender and shall include a standard mortgage clause. Lender shall have the right to hold the policies and renewals. If Lender requires, Borrower shall promptly give to Lender all receipts of paid premiums and renewal notices. In the event of loss, Borrower shall give prompt notice to the insurance carrier and Lender. Lender may make proof of loss if not made promptly by Borrower.

Unless Lender and Borrower otherwise agree in writing, or applicable Law otherwise requires, insurance proceeds shall be applied first to reimburse Lender for costs and expenses incurred in connection with obtaining any such insurance proceeds, and then, at Lender's option, in such order and proportion as Lender may determine in its sole and absolute discretion, and regardless of any impairment of security or lack thereof: (i) to the sums secured by this Security Instrument, whether or not then due, and to such components thereof as Lender may determine in its sole and absolute discretion; and/or (ii) to Borrower to pay the costs and expenses of necessary repairs or restoration of the Property to a condition satisfactory to Lender. If Borrower abandons the Property, or does not answer within 30 days a notice from Lender that the insurance carrier has offered to settle a claim, Lender may collect the insurance proceeds. Lender may, in its sole and absolute discretion, and regardless of any impairment of security or lack thereof, use the proceeds to repair or restore the Property or to pay the sums secured by this Security Instrument, whether or not then due. The 30-day period will begin when the notice is given.

Unless Lender and Borrower otherwise agree in writing, any application of proceeds to principal shall not extend or postpone the due date of the monthly payments referred to in paragraphs 1 and 2 or change the amount of the payments. If under paragraph 21 the Property is acquired by Lender, Borrower's right to any insurance policies and proceeds resulting from damage to the Property prior to the acquisition shall pass to Lender to the extent of the sums secured by this Security Instrument immediately prior to the acquisition.

If Borrower obtains earthquake insurance, any other hazard insurance, or any other insurance on the Property and such insurance is not specifically required by Lender, then such insurance shall (i) name Lender as loss payee thereunder, and (ii) be subject to the provisions of this paragraph 5.

**6. Occupancy, Preservation, Maintenance and Protection of the Property; Borrower's Loan Application; Leaseholds.** Borrower acknowledges that the Lender does not desire to make a loan to Borrower secured by this property on the terms contained in the Note unless the property is to be occupied by Borrower as Borrower's primary/secondary residence. Lender makes non-owner residence loans of different terms. Borrower promises and assures Lender that Borrower intends to occupy this property as Borrower's primary/secondary residence and that Borrower will so occupy this property as its sole primary/secondary residence within sixty (60) days after the date of the Security Instrument. If Borrower breaches this promise to occupy the property as Borrower's primary/secondary residence, then Lender may invoke any of the following remedies, in addition to the remedies provided in the Security Instrument; (1) Declare all sums secured by the Security Instrument due and payable and foreclose the Security Instrument, (2) Decrease the term of the loan and adjust the monthly payments under the Note accordingly, increase the

interest rate and adjust the monthly payments under the Note accordingly, or (3) require that the principal balance be reduced to a percentage of either the original purchase price or the appraised value then being offered on non-owner occupied loans.

Borrower shall not destroy, damage or impair the Property, allow the Property to deteriorate, or commit waste on the Property. Borrower shall be in default if any forfeiture action or proceedings, whether civil or criminal, is begun that in Lender's good faith judgment could result in forfeiture of the Property or otherwise materially impair the lien created by this Security Instrument or Lender's security interest. Borrower may cure such a default and reinstate, as provided in paragraph 18, by causing the action or proceeding to be dismissed with a ruling that, in Lender's good faith determination, precludes forfeiture of the Borrower's interest in the Property or other material impairment of the lien created by this Security Instrument or Lender's security interest. Borrower shall also be in default if Borrower, during the loan application process, gave materially false or inaccurate information or statements to Lender (or failed to provide Lender with any material information) in connection with the loan evidenced by the Note, including, but not limited to, representations concerning Borrower's occupancy of the Property as a principal residence. If this Security Instrument is on a leasehold, Borrower shall comply with all the provisions of the lease. If Borrower acquires fee title to the Property, the leasehold and the fee title shall not merge unless Lender agrees to the Borrower, in writing.

Borrower shall, at Borrower's own expense, appear in and defend any action or proceeding purporting to affect the Property or any portion thereof or Borrower's title thereto, the validity or priority of the lien created by this Security Instrument, or the rights or powers of Lender or Trustee with respect to this Security Instrument or the Property. All causes of action of Borrower, whether accrued before or after the date of this Security Instrument, for damage or injury to the Property or any part thereof, or in connection with any transaction financed in whole or in part by the proceeds of the Note or any other note secured by this Security Instrument, by Lender, or in connection with or affecting the Property or any part thereof, including causes of action arising in tort or contract and causes of action for fraud or concealment of a material fact, are, at Lender's option, assigned to Lender, and the proceeds thereof shall be paid directly to Lender who, after deducting therefrom all its expenses, including reasonable attorneys' fees, may apply such proceeds to the sums secured by this Security Instrument or to any deficiency under this Security Instrument or may release any monies so received by it or any part thereof, as Lender may elect. Lender may, at its option, appear in and prosecute in its own name any action or proceeding to enforce any such cause of action and may make any compromise or settlement thereof. Borrower agrees to execute such further assignments and any other instruments as from time to time may be necessary to effectuate the foregoing provisions and as Lender shall request.

**7. Protection of Lender's Rights in the Property.** If Borrower fails to perform the covenants and agreements contained in this Security Instrument, or there is a legal proceeding that may significantly affect Lender's rights in the Property (such as a proceeding in bankruptcy, probate, for condemnation or forfeiture or to enforce laws or regulations), then Lender may do and pay for whatever is necessary to protect the value of the Property and Lender's rights in the Property. Lender's actions may include paying any sums secured by a lien which has priority over this Security Instrument, appearing in court, paying reasonable attorneys' fees and entering on the Property to make repairs. Although Lender may take action under this paragraph 7, Lender does not have to do so.

Any amounts disbursed by Lender under this paragraph 7 shall become additional debt of Borrower secured by this Security Instrument. Unless Borrower and Lender agree to other terms of payment, these amounts shall bear interest from the date of disbursement at the Note rate in effect from time to time and shall be payable, with interest, upon notice from Lender to Borrower requesting payment.

**8. Mortgage Insurance.** If Lender required mortgage insurance as a condition of making the loan secured by this Security Instrument, Borrower shall pay the premiums required to maintain the mortgage insurance in effect. If, for any reason, the mortgage insurance coverage required by Lender lapses or ceases to be in effect, Borrower shall pay the premiums required to obtain coverage substantially equivalent to the mortgage insurance previously in effect, at a cost substantially equivalent to the cost to Borrower of the mortgage insurance previously in effect, from an alternate mortgage insurer approved by Lender. If substantially equivalent mortgage insurance coverage is not available, Borrower shall pay to Lender each month a sum equal to one-twelfth of the yearly mortgage insurance premium being paid by Borrower when the insurance coverage lapsed or ceased to be in effect. Lender will accept, use and retain these payments as a loss reserve in lieu of mortgage insurance. Loss reserve payments may no longer be required, at the option of Lender, if mortgage insurance coverage (in the amount and for the period that Lender requires) provided by an insurer approved by Lender again becomes available and is obtained. Borrower shall pay the premiums required to maintain mortgage insurance in effect, or to provide a loss reserve, until the requirement for mortgage insurance ends in accordance with any written agreement between Borrower and Lender or applicable law.

**9. Inspection.** Lender or its agent may make reasonable entries upon and inspections of the Property. Lender shall give Borrower notice at the time of or prior to an inspection specifying reasonable cause for the inspection.

**10. Condemnation.** The proceeds of any award or claim for damages, direct or consequential, in connection with any condemnation or other taking of any part of the Property, or for conveyance in lieu of condemnation, are hereby assigned and shall be paid to Lender. Lender may apply, use or release the condemnation proceeds in the same manner as provided in paragraph 5 hereof with respect to insurance proceeds.

If the Property is abandoned by Borrower, or if, after notice by Lender to Borrower that the condemnor offers to make an award or settle a claim for damages, Borrower fails to respond to Lender within 30 days after the date the notice is given, Lender is authorized to collect and apply the proceeds, at its option, either to restoration or repair of the Property or to the sums secured by this Security Instrument, whether or not then due.

Unless Lender and Borrower otherwise agree in writing, any application of proceeds to principal shall not extend or postpone the due date of the monthly payments referred to in paragraphs 1 and 2 or change the amount of such payments.

**11. Borrower Not Released; Forbearance By Lender Not a Waiver.** Extension of the time for payment or modification of amortization of the sums secured by this Security Instrument granted by Lender to any successor in interest of Borrower shall not operate to release the liability of the original Borrower or Borrower's successors in interest. Lender shall not be required to commence proceedings against any successor in interest or refuse to extend time for payment or otherwise modify amortization of the sums secured by this Security Instrument by reason of any demand made by the original Borrower or Borrower's successors in interest. Any forbearance by Lender in exercising any right or remedy shall not be a waiver of or preclude the exercise of any right or remedy.

**12. Successors and Assigns Bound; Joint and Several Liability; Co-signers.** The covenants and agreements of this Security Instrument shall bind and benefit the successors and assigns of Lender and Borrower, subject to the provisions of paragraph 17. Borrower's covenants and agreements shall be joint and several. Any Borrower who co-signs this Security Instrument but does not execute the Note: (a) is co-signing this Security Instrument only to mortgage, grant and convey that Borrower's interest in the Property under the terms of this Security Instrument; (b) is not personally obligated to pay the sums secured by this Security Instrument; and (c) agrees that Lender and any other Borrower may agree to extend, modify, forbear or make any accommodations with regard to the terms of this Security Instrument or the Note without that Borrower's consent.

**13. Loan Charges.** If the loan secured by this Security Instrument is subject to a law which sets maximum loan charges, and that law is finally interpreted so that the interest or other loan charges collected or to be collected in connection with the loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from Borrower which exceeded permitted limits will be refunded to Borrower. Lender may choose to make this refund by reducing the principal owed under the Note or by making a direct payment to Borrower. If a refund reduces principal, the reduction will be treated as a partial prepayment without any prepayment charge under the Note.

**14. Notices.** Any notice to Borrower provided for in this Security Instrument shall be given by delivering it or by mailing it by first class mail unless applicable law requires use of another method. The notice shall be directed to the Property Address or any other address Borrower designates by notice to Lender. Any notice to Lender shall be given by first class mail to Lender's address stated herein or any other address Lender designates by notice to Borrower. Any notice provided for in this Security Instrument shall be deemed to have been given to Borrower or Lender when given as provided in this paragraph.

**15. Governing Law; Severability.** This Security Instrument shall be governed by federal law and the law of the jurisdiction in which the Property is located. In the event that any provision or clause of this Security Instrument or the Note conflicts with applicable law, such conflict shall not affect other provisions of this Security Instrument or the Note which can be given effect without the conflicting provision. To this end the provisions of this Security Instrument and the Note are declared to be severable.

**16. Borrower's Copy.** Borrower shall be given one conformed copy of the Note and of this Security Instrument.

**17. Transfer of the Property or a Beneficial Interest in Borrower.** If all or any part of the Property or any interest in it is sold or transferred (or if a beneficial interest in Borrower is sold or transferred and Borrower is not a natural person) without Lender's prior written consent, Lender may, at its option, require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if exercise is prohibited by federal law as of the date of this Security Instrument.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is delivered or mailed within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

**18. Borrower's Right to Reinstate.** If Borrower meets certain conditions, Borrower shall have the right to have enforcement of this Security Instrument discontinued at any time prior to the earlier of: (a) 5 days (or such other period as applicable law may specify for reinstatement) before sale of the Property pursuant to any power of sale contained in this Security Instrument; or (b) entry of a judgment enforcing this Security Instrument. Those conditions are that Borrower: (a) pays Lender all sums which then would be due under this Security Instrument and the Note as if no acceleration had occurred; (b) cures any default of any other covenants or agreements; (c) pays all expenses incurred in enforcing this Security Instrument, including, but not limited to, reasonable attorneys' fees; and (d) takes such action as Lender may reasonably require to assure that the lien of this Security Instrument, Lender's rights in the Property and Borrower's obligation to pay the sums secured by this Security Instrument shall continue unchanged. Upon reinstatement by Borrower, this Security Instrument and the obligations secured hereby shall remain fully effective as if no acceleration had occurred. However, this right to reinstate shall not apply in the case of acceleration under paragraph 17.

**19. Sale of Note; Change of Loan Servicer.** The Note or a partial interest in the Note (together with this Security Instrument) may be sold one or more times without prior notice to Borrower. A sale may result in a change in the entity (known as the "Loan Servicer") that collects monthly payments due under the Note and this Security Instrument. There also may be one or more changes of the Loan Servicer unrelated to a sale of the Note. If there is a change of the Loan Servicer, Borrower will be given written notice of the change in accordance with paragraph 14 above and applicable law. The notice will state the name and address of the new Loan Servicer and the address to which payments should be made. The notice will also contain any other information required by applicable law. The holder of the Note and this Security Instrument shall be deemed to be the Lender hereunder.

NCD10015.wp (07-19-02)

Date: 02/03/06

20. **Hazardous Substances.** Borrower shall not cause or permit the presence, use, disposal, storage, or release of any Hazardous Substances on or in the Property. Borrower shall not do, nor allow anyone else to do, anything affecting the Property that is in violation of any Environmental Law. The preceding two sentences shall not apply to the presence, use, or storage on the Property of small quantities of Hazardous Substances that are generally recognized to be appropriate to normal residential uses and to maintenance of the Property.

Borrower shall promptly give Lender written notice of any investigation, claim, demand, lawsuit or other action by any governmental or regulatory agency or private party involving the Property and any Hazardous Substance or Environmental Law of which Borrower has actual knowledge. If Borrower learns, or is notified by any governmental or regulatory authority, that any removal or other remediation of any Hazardous Substance affecting the Property is necessary, Borrower shall promptly take all necessary remedial actions in accordance with Environmental Law.

Borrower shall be solely responsible for, shall indemnify, defend and hold harmless Lender, its directors, officers, employees, attorneys, agents, and their respective successors and assigns, from and against any and all claims, demands, causes of action, loss, damage, cost (including actual attorneys' fees and court costs and costs of any required or necessary repair, cleanup or detoxification of the Property and the preparation and implementation of any closure, abatement, containment, remedial or other required plan), expenses and liability directly or indirectly arising out of or attributable to (a) the use, generation, storage, release, threatened release, discharge, disposal, abatement or presence of Hazardous Substances on, under or about the Property, (b) the transport to or from the Property of any Hazardous Substances, (c) the violation of any Hazardous Substances law, and (d) any Hazardous Substances claims.

As used in this paragraph 20, "Hazardous Substances" are those substances defined as toxic or hazardous substances by Environmental Law and the following substances: gasoline, kerosene, or other flammable or toxic petroleum products, toxic pesticides and herbicides, volatile solvents, materials containing asbestos or formaldehyde, and radioactive materials. As used in this paragraph 20, "Environmental Law" means federal laws and laws of the jurisdiction where the Property is located that relate to health, safety or environmental protection.

ADDITIONAL COVENANTS. Borrower and Lender further covenant and agree as follows:

21. **Acceleration; Remedies.** If any installment under the Note or notes secured hereby is not paid when due, or if Borrower should be in default under any provision of this Security Instrument, or if Borrower is in default under any other deed of trust or other instrument secured by the Property, all sums secured by this Security Instrument and accrued interest thereon shall at once become due and payable at the option of Lender without prior notice, except as otherwise required by applicable law, and regardless of any prior forbearance. In such event, Lender, at its option, and subject to applicable law, may then or thereafter invoke the power of sale and/or any other remedies or take any other actions permitted by applicable law. Lender will collect all expenses incurred in pursuing the remedies described in this Paragraph 21, including, but not limited to, reasonable attorneys' fees and costs of title evidence.

If Lender invokes power of sale, and if it is determined in a hearing held in accordance with applicable law that Trustee can proceed to sale, Trustee shall take such action regarding notice of sale and shall give such notices to Borrower and to other persons as applicable law may require. After the time required by applicable law and after publication of the notice of sale, Trustee, without demand on Borrower, shall sell the Property at public auction to the highest bidder at the time and place and under the terms designated in the notice of sale in one or more parcels and in any order Trustee determine. Lender or its designee may purchase the Property at any sale. Trustee shall deliver to the purchaser Trustee's deed conveying the Property without any covenant or warranty, expressed or implied. The recitals in the Trustee's deed shall be prima facie evidence of the truth of the statements made therein. Trustee shall apply the proceeds of the sale in the following order: (a) to all expenses of the sale, including, but not limited to, Trustee's fees of five (5%) of the gross sale price; (b) to all sums secured by this Security Instrument; and (c) any excess to the person or persons legally entitled to it. The interest rate set forth in the Note shall apply whether before or after any judgment on the indebtedness evidenced by the Note.

22. **Release.** Upon payment of all sums secured by this Security Instrument, Lender or Trustee shall cancel this Security Instrument without charge to Borrower. If Trustee is requested to release this Security Instrument, Lender or Trustee shall cancel this Security Instrument without charge to Borrower. If Trustee is requested to release this Security Instrument, all notes evidencing debt secured by this Security Instrument shall be surrendered to Trustee. Borrower shall pay any recordation costs.

23. **Substitute Trustee.** Lender may from time to time remove Trustee and appoint a successor trustee to any Trustee appointed hereunder by an instrument recorded in the county in which this Security Instrument is recorded. Without conveyance of the Property, the successor trustee shall succeed to all the title, power and duties conferred upon Trustee herein and by applicable law.

24. **Misrepresentation and Nondisclosure.** Borrower has made certain written representations and disclosures in order to induce Lender to make the loan evidenced by the Note or notes which this Security Instrument secures, and in the event that Borrower has made any material misrepresentation or failed to disclose any material fact, Lender, at its option and without prior notice or demand, shall have the right to declare the indebtedness secured by this Security Instrument, irrespective of the maturity

Case 08-81715    Doc 26    Filed 03/22/11    Page 11 of 32

date specified in the Note or notes secured by this Security Instrument, immediately due and payable. To the extent permitted by applicable law, Trustee, upon presentation to it of an affidavit signed by Lender setting forth facts showing a default by Borrower under this paragraph, is authorized to accept as true and conclusive all facts and statements therein, and to act thereon hereunder.

    25. **Time is of the Essence.** Time is of the essence in the performance of each provision of this Security Instrument.

    26. **Waiver of Statute of Limitations.** The pleading of the statute of limitations as a defense to enforcement of this Security Instrument, or any and all obligations referred to herein or secured hereby, is hereby waived to the fullest extent permitted by applicable law.

    27. **Modification.** This Security Instrument may be modified or amended only by an agreement in writing signed by Borrower and Lender or lawful successors in interest.

    28. **Reimbursement.** To the extent permitted by applicable law, Borrower shall reimburse Trustee and Lender for any and all costs, fees and expenses which either may incur, expend or sustain in the execution of the trust created hereunder or in the performance of any act required or permitted hereunder or by law or in equity or otherwise arising out of or in connection with this Security Instrument, the Note, any other note secured by this Security Instrument or any other instrument executed by Borrower in connection with the Note or Security Instrument. To the extent permitted by applicable law, Borrower shall pay to Trustee and Lender their fees in connection with Trustee and Lender including, but not limited to assumption application fees; fees for payoff demands and, statements of loan balance; fees for making, transmitting and transporting copies of loan documents, verifications, full or partial lien releases and other documents requested by borrower or necessary for performance of Lender's rights or duties under this Security Instrument; fees arising from a returned or dishonored check; fees to determine whether the Property is occupied, protected, maintained or insured or related purposes; appraisal fees, inspection fees, legal fees, broker fees, insurance mid-term substitutions, repair expenses, foreclosure fees and costs arising from foreclosure of the Property and protection of the security for this Security Instrument; and all other fees and costs of a similar nature not otherwise prohibited by law.

    29. **Clerical Error.** In the event Lender at any time discovers that the Note, any other note secured by this Security Instrument, the Security Instrument, or any other document or instrument executed in connection with the Security Instrument, Note or notes contains an error that was caused by a clerical mistake, calculation error, computer malfunction, printing error or similar error, Borrower agrees, upon notice from Lender, to re-execute any documents that are necessary to correct any such error(s). Borrower further agrees that Lender will not be liable to Borrower for any damages incurred by Borrower that are directly or indirectly caused by any such error.

    30. **Lost Stolen, Destroyed or Mutilated Security Instrument and Other Documents.** In the event of the loss, theft or destruction of the Note, any other note secured by this Security Instrument, the Security Instrument or any other documents or instruments executed in connection with the Security Instrument, Note or notes (collectively, the "Loan Documents"), upon Borrower's receipt of an indemnification executed in favor of Borrower by Lender, or, in the event of the mutilation of any of the Loan Documents, upon Lender's surrender to Borrower of the mutilated Loan Document, Borrower shall execute and deliver to Lender a Loan Document in form and content identical to, and to serve as a replacement of, the lost, stolen, destroyed, or mutilated Loan document, and such replacement shall have the same force and effect as the lost, stolen, destroyed, or mutilated Loan Documents, and may be treated for all purposes as the original copy of such Loan Document.

    31. **Assignment of Rents.** As additional security hereunder, Borrower hereby assigns to Lender the rents of the Property. Borrower shall have the right to collect and retain the rents of the Property as they become due and payable provided Lender has not exercised its rights to require immediate payment in full of the sums secured by this Security instrument and Borrower has not abandoned the Property.

    32. **Riders to this Security Instrument.** If one or more riders are executed by Borrower and recorded together with this Security Instrument, the covenants and agreements of each such rider shall be incorporated into and shall amend and supplement the covenants and agreements of this Security Instrument as if the rider(s) were a part of this Security Instrument.
[Check applicable box(es)]

| | | |
|---|---|---|
| [X] Adjustable Rate Rider | [ ] Condominium Rider | [ ] 1-4 Family Rider |
| [ ] Manufactured Home Rider | [ ] Planned Unit Development Rider | [ ] Occupancy Rider |
| [ ] Other(s) (specify) | | |

BY SIGNING UNDER SEAL BELOW, Borrower accepts and agrees to the terms and covenants contained in this Security Instrument and in any rider(s) executed by Borrower and recorded with it.

Witnesses:

_____ (Seal)
                                 -Borrower

_____ (Seal)
                                 -Borrower

_____ (Seal)
*Hossies Mc Duffie*
HOSSIES   MCDUFFIE         -Borrower

_____ (Seal)
*Bernice Harris*
BERNICE   HARRIS           -Borrower

_____ (Seal)
                                 -Borrower

_____ (Seal)
                                 -Borrower

_____[Space Below This Line For Acknowledgment]_____

STATE OF NORTH CAROLINA,    *Moore*          County ss:

I, *Melissa S Benton*, a Notary Public of the County of *Moore*,

State of North Carolina, do hereby certify that _____

*Hossies McDuffie and Bernice Harris*

personally appeared before me this day and acknowledged the due execution of the foregoing instrument.

Witness my hand and official seal this _____ day of *February*, *2006*.

My Commission Expires:

*7/22/08*                          *Melissa S Benton*
                                   Notary Public

[Notary Seal: MELISSA S. BENTON / NOTARY / PUBLIC / MOORE COUNTY, NC]

STATE OF NORTH CAROLINA,                      County ss:

The foregoing certificate of _____, a Notary Public of the County of _____,

State of _____, is certified to be correct.

This _____ day of _____, _____.


                            Registrar of Deeds


                    By: _____
                        Deputy Assistant

Case 08-81715   Doc 26   Filed 03/22/11   Page 13 of 32

Date: 02/03/06

# ADJUSTABLE RATE RIDER
## (LIBOR Index - Rate Caps)

THIS ADJUSTABLE RATE RIDER is made  February 03, 2006                        ,
and is incorporated into and shall be deemed to amend and supplement the Mortgage, Deed of Trust or Security Deed (the "Security Instrument") of the same date given by the undersigned (the "Borrower") to secure Borrower's Adjustable Rate Note (the "Note") to

Option One Mortgage Corporation, a California Corporation

(the "Lender") of the same date and covering the property described in the Security Instrument and located at:

2215 E INDIANA AVE,  SOUTHERN PINES, NC 28387-7407

[Property Address]

**THE NOTE CONTAINS PROVISIONS ALLOWING FOR CHANGES IN THE INTEREST RATE AND THE MONTHLY PAYMENT. THE NOTE LIMITS THE AMOUNT THE BORROWER'S INTEREST RATE CAN CHANGE AT ANY ONE TIME AND THE MAXIMUM RATE THE BORROWER MUST PAY.**

**ADDITIONAL COVENANTS.** In addition to the covenants and agreements made in the Security Instrument, Borrower and Lender further covenant and agree as follows:

**The Note** provides for an initial interest rate of              8.700%              . The Note provides for changes in the interest rate and the monthly payments, as follows:

## 4.    INTEREST RATE AND MONTHLY PAYMENT CHANGES
### (A) Change Dates
The interest rate I will pay may change on the first day of   March 01      2008          ,
and on that day every sixth month thereafter. Each date on which my interest rate could change is called a "Change Date."

### (B) The Index
Beginning with the first Change Date, my interest rate will be based on an Index. The "Index" is the average of interbank offered rates for six-month U.S. dollar-denominated deposits in the London market ("LIBOR"), as published in *The Wall Street Journal*. The most recent Index figure available as of the first business day of the month immediately preceding the month in which the Change Date occurs is called the "Current Index."

If the Index is no longer available, the Note Holder will choose a new index that is based upon comparable information. The Note Holder will give me notice of this choice.

### (C) Calculation of Changes
Before each Change Date, the Note Holder will calculate my new interest rate by adding
SIX AND 45/100                              percentage point(s) ( 6.450%    )
to the Current Index. The Note Holder will then round the result of this addition to the next higher one-eighth of one percentage point (0.125%). Subject to the limits stated in Section 4(D) below, this rounded amount will

be my new interest rate until the next Change Date.

The Note Holder will then determine the amount of the monthly payment that would be sufficient to repay the unpaid principal that I am expected to owe at the Change Date in full on the Maturity Date at my new interest rate in substantially equal payments. The result of this calculation will be the new amount of my monthly payment.

**(D) Limits on Interest Rate Changes**

The interest rate I am required to pay at the first Change Date will not be greater than 11.700% or less than 8.700% . Thereafter, my interest rate will never be increased or decreased on any single Change Date by more than one percentage point (1.0%) from the rate of interest I have been paying for the preceding six months. In no event will my interest rate be greater than 14.700% or less than 8.700% .

**(E) Effective Date of Changes**

My new interest rate will become effective on each Change Date. I will pay the amount of my new monthly payment beginning on the first monthly payment date after the Change Date until the amount of my monthly payment changes again.

**(F) Notice of Changes**

The Note Holder will deliver or mail to me a notice of any changes in my interest rate and the amount of my monthly payment before the effective date of any change. The notice will include information required by law to be given me and also the title and telephone number of a person who will answer any question I may have regarding the notice.

**TRANSFER OF THE PROPERTY OR A BENEFICIAL INTEREST IN BORROWER**

Covenant 17 of the Security Instrument is amended to read as follows:

**Transfer of the Property or a Beneficial Interest in Borrower.** If all or any part of the Property or any interest in it is sold or transferred (or if a beneficial interest in Borrower is sold or transferred and Borrower is not a natural person) without Lender's prior written consent, Lender may, at its option, require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if exercise is prohibited by federal law as of the date of this Security Instrument. Lender also shall not exercise this option if: (a) Borrower causes to be submitted to Lender information required by Lender to evaluate the intended transferee as if a new loan were being made to the transferee; and (b) Lender reasonably determines that Lender's security will not be impaired by the loan assumption and that the risk of a breach of any covenant or agreement in this Security Instrument is acceptable to Lender.

To the extent permitted by applicable law, Lender may charge a reasonable fee as a condition to Lender's consent to the loan assumption. Lender may also require the transferee to sign an assumption agreement that is acceptable to Lender and that obligates the transferee to keep all the promises and agreements made in the Note and in this Security Instrument. Borrower will continue to be obligated under the Note and this Security Instrument unless Lender releases Borrower in writing.

If Lender exercises the option to require immediate payment in full, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is delivered or mailed within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

MULTISTATE ADJUSTABLE RATE RIDER-LIBOR INDEX-Single Family
Page 2 of 3
USRI0022 (02-23-99)

Date: 02/03/06

    BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Adjustable Rate Rider.

_Hossies Mc.Duffie_ (Seal)          _____ (Seal)
HOSSIES   MCDUFFIE

_____ (Seal)          _____ (Seal)

_Bernice Harris_ (Seal)          _____ (Seal)
BERNICE   HARRIS

## EXHIBIT "A"

Lot 2 as shown on Plat entitled "Subdivision for James E. Easterling and wife, Ruby C. Easterling, Sandhill Township, Moore County, North Carolina", prepared by Strother Land Surveying, dated September 15, 1999, appearing of record in the Office of the Register of Deeds in Plat Cabinet 7, Slide 923, to which record reference is hereby made for a more particular description

Date: 02/03/06

## ADJUSTABLE RATE NOTE
### (LIBOR Index - Rate Caps)

**THIS NOTE CONTAINS PROVISIONS ALLOWING FOR CHANGES IN MY INTEREST RATE AND MY MONTHLY PAYMENT. THIS NOTE LIMITS THE AMOUNT MY INTEREST RATE CAN CHANGE AT ANY ONE TIME AND THE MAXIMUM RATE I MUST PAY.**


NOTE / NOTE

2215 E INDIANA AVE,    SOUTHERN PINES, NC 28387-7407
[Property Address]

**1.    BORROWER'S PROMISE TO PAY**
      In return for a loan that I have received, I promise to pay U.S.    $115,360.00                    (this amount is called "principal"), plus interest, to the order of the Lender. The Lender is
Option One Mortgage Corporation, a California Corporation                                          .
I understand that the Lender may transfer this Note. The Lender or anyone who takes this Note by transfer and who is entitled to receive payments under this Note is called the "Note Holder."

**2.    INTEREST**
      Interest will be charged on unpaid principal until the full amount of principal has been paid.  Interest will be calculated on the basis of a 12-month year and a 30-day month. I will pay interest at a yearly rate of    8.700%         . The interest rate I will pay may change in accordance with Section 4 of this Note.
      The interest rate required by this Section 2 and Section 4 of this Note is the rate I will pay both before and after any default described in Section 7(B) of this Note.

**3.    PAYMENTS**
      **(A) Time and Place of Payments**
      I will pay principal and interest by making payments every month.
      I will make my monthly payments on the first day of each month beginning on    April 01         , 2006      .
I will make these payments every month until I have paid all of the principal and interest and any other charges described below that I may owe under this Note. My monthly payments will be applied to interest before principal. If, on,
      March 01          , 2036        , I still owe amounts under this Note, I will pay those amounts in full on that date, which is called the "Maturity Date."
      I will make my monthly payments at    Option One Mortgage Corporation
                              P.O. BOX 92103 LOS ANGELES, CA 90009-2103
or at a different place if required by the Note Holder.
      **(B) Amount of My Initial Monthly Payments**
      Each of my initial monthly payments will be in the amount of U.S.    $903.42           . This amount may change.
      **(C) Monthly Payment Changes**
      Changes in my monthly payment will reflect changes in the unpaid principal of my loan and in the interest rate that I must pay. The Note Holder will determine my new interest rate and the changed amount of my monthly payment in accordance with Section 4 of this Note.
      **(D) Application of Payments**
      Payments received by the Note Holder will be applied in the following order: (i) prepayment charges due under this Note; (ii) amounts payable under paragraph 2 of the Security Instrument (defined below); (iii) interest due under this Note; (iv) principal due under this Note; and (v) late charges due under this Note.

**4.    INTEREST RATE AND MONTHLY PAYMENT CHANGES**
      **(A) Change Dates**
      The interest rate I will pay may change on the first day of    March             , 2008       ,
and on that day every sixth month thereafter. Each date on which my interest rate could change is called a "Change Date."
      **(B) The Index**
      Beginning with the first Change Date, my interest rate will be based on an Index. The "Index" is the average of interbank offered rates for six-month U.S. dollar-denominated deposits in the London market ("LIBOR"), as published in *The Wall Street Journal*. The most recent Index figure available as of the first business day of the month immediately preceding the month in which the Change Date occurs is called the "Current Index."
      If the Index is no longer available, the Note Holder will choose a new index that is based upon comparable information. The Note Holder will give me notice of this choice.
      **(C) Calculation of Changes**
      Before each Change Date, the Note Holder will calculate my new interest rate by adding
            SIX AND 45/100                 percentage point(s) (   6.450%      )
to the Current Index. The Note Holder will then round the result of this addition to the next higher one-eighth of one percentage point (0.125%). Subject to the limits stated in Section 4(D) below, this rounded amount will be my new interest rate until the next Change Date.
      The Note Holder will then determine the amount of the monthly payment that would be sufficient to repay the unpaid principal that I am expected to owe at the Change Date in full on the Maturity Date at my new interest rate in substantially equal payments. The result of this calculation will be the new amount of my monthly payment.

CERTIFIED TO BE A TRUE AND
CORRECT COPY OF THE ORIGINAL

Date: 02/03/06

**(D) Limits on Interest Rate Changes**

The interest rate I am required to pay at the first Change Date will not be greater than    11.700%    or less than 8.700%    . Thereafter, my interest rate will never be increased or decreased on any single Change Date by more than one percentage point (1.0%) from the rate of interest I have been paying for the preceding six months. In no event will my interest rate be greater than    14.700%    or less than    8.700%    .

**(E) Effective Date of Changes**

My new interest rate will become effective on each Change Date. I will pay the amount of my new monthly payment beginning on the first monthly payment date after the Change Date until the amount of my monthly payment changes again.

**(F) Notice of Changes**

The Note Holder will deliver or mail to me a notice of any changes in my interest rate and the amount of my monthly payment before the effective date of any change. The notice will include information required by law to be given me and also the title and telephone number of a person who will answer any question I may have regarding the notice.

**5.    BORROWER'S RIGHT TO PREPAY**

I have the right to make payments of principal at any time before they are due together with accrued interest. A payment of principal only is known as a "prepayment." When I make a prepayment, I will tell the Note Holder in a letter that I am doing so. A prepayment of all of the unpaid principal is known as a "full prepayment." A prepayment of only part of the unpaid principal is known as a "partial prepayment."

If I make a partial prepayment, there will be no changes in the due dates of my monthly payments unless the Note Holder agrees in writing to those changes.

If within    30 Months    from the date of execution of the Security Instrument, I make a full prepayment or, a partial prepayment as described herein, I will at the same time pay to the Note Holder a prepayment charge. The prepayment charge will be equal to one percent (1%) of the amount prepaid.  Notwithstanding, I will not be required to pay a prepayment charge to the Note Holder in connection with any prepayment made if the original principal amount of the Note is $150,000.00 or less. In no event will such a charge be made unless it is authorized by state or federal law.

**\*\*NO PREPAYMENT CHARGE NOTE ADDENDUM ATTACHED HERETO AND MADE A PART HEREOF\*\***

**6.    LOAN CHARGES**

If a law, which applies to this loan and which sets maximum loan charges, is finally interpreted so that the interest or other loan charges collected or to be collected in connection with this loan exceed the permitted limits, then: (i) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (ii) any sums already collected from me which exceeded permitted limits will be refunded to me. The Note Holder may choose to make this refund by reducing the principal I owe under this Note or by making a direct payment to me. If a refund reduces principal, the reduction will be treated as a partial prepayment.

**7.    BORROWER'S FAILURE TO PAY AS REQUIRED**

**(A) Late Charges for Overdue Payments**

If the Note Holder has not received the full amount of any monthly payment by the end of    15    calendar days after the date it is due, I will pay a late charge to the Note Holder. The amount of the charge will be    4.000%  of my overdue payment of principal and interest. I will pay this late charge promptly but only once on each late payment.

**(B) Default**

If I do not pay the full amount of each monthly payment on the date it is due, I will be in default. If I am in default, the Note Holder may require me to pay immediately the full amount of principal which has not been paid and all interest that I owe on that amount, together with any other charges that I owe under this Note or the Security Instrument, except as otherwise required by applicable law.

**(C) No Waiver by Note Holder**

Even if, at a time when I am in default, the Note Holder does not require me to pay immediately in full as described above, the Note Holder will still have the right to do so if I am in default at a later time.

**(D) Payment of Note Holder's Costs and Expenses**

If the Note Holder has required me to pay immediately in full as described above, the Note Holder will have the right to be paid back by me for all of its costs and expenses in enforcing this Note to the extent not prohibited by applicable law, whether or not a lawsuit is filed. Those expenses include, for example, reasonable attorneys' fees.

**8.    GIVING OF NOTICES**

Unless applicable law requires a different method, any notice that must be given to me under this Note will be given by delivering it or by mailing it by first class mail to me at the Property Address above or at a different address if I give the Note Holder a notice of my different address.

Any notice that must be given to the Note Holder under this Note will be given by mailing it by first class mail to the Note Holder at the address stated in Section 3(A) above or at a different address if I am given a notice of that different address.

**9.    OBLIGATIONS OF PERSONS UNDER THIS NOTE**

If more than one person signs this Note, each person is fully and personally obligated to keep all of the promises made in this Note, including the promise to pay the full amount owed. Any person who is a guarantor, surety or endorser of this Note is also obligated to do these things. Any person who takes over these obligations, including the obligations of a guarantor, surety or endorser of this Note, is also obligated to keep all of the promises made in this Note. The Note Holder may enforce its rights under this Note against each person individually or against all of us together. This means that any one of us may be required to pay all of the amounts owed under this Note.

Case 08-81715    Doc 26    Filed 03/22/11    Page 19 of 32

10.    **WAIVERS**

I and any other person who has obligations under this Note waive the rights of presentment and notice of dishonor. "Presentment" means the right to require the Note Holder to demand payment of amounts due. "Notice of dishonor" means the right to require the Note Holder to give notice to other persons that amounts due have not been paid.

11.    **SECURED NOTE**

In addition to the protections given to the Note Holder under this Note, a Mortgage, Deed of Trust or Security Deed (the "Security Instrument"), dated the same date as this Note, protects the Note Holder from possible losses which might result if I do not keep the promises that I make in this Note. That Security Instrument describes how and under what conditions I may be required to make immediate payment in full of all amounts I owe under this Note. Some of those conditions are described as follows:

**Transfer of the Property or a Beneficial Interest in Borrower.** If all or any part of the Property or any interest in it is sold or transferred (or if a beneficial interest in Borrower is sold or transferred and Borrower is not a natural person) without Lender's prior written consent, Lender may, at its option, require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if exercise is prohibited by federal law as of the date of this Security Instrument. Lender also shall not exercise this option if: (a) Borrower causes to be submitted to Lender information required by Lender to evaluate the intended transferee as if a new loan were being made to the transferee; and (b) Lender reasonably determines that Lender's security will not be impaired by the loan assumption and that the risk of a breach of any covenant or agreement in this Security Instrument is acceptable to Lender.

To the extent permitted by applicable law, Lender may charge a reasonable fee as a condition to Lender's consent to the loan assumption. Lender may also require the transferee to sign an assumption agreement that is acceptable to Lender and that obligates the transferee to keep all the promises and agreements made in the Note and in this Security Instrument. Borrower will continue to be obligated under the Note and this Security Instrument unless Lender releases Borrower in writing.

If Lender exercises the option to require immediate payment in full, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is delivered or mailed within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

WITNESS THE HAND(S) AND SEAL(S) OF THE UNDERSIGNED.

_Hossies Mc. Duffie_ _____ (Seal)
HOSSIES   MCDUFFIE                              -Borrower

_____ (Seal)
                                -Borrower

_____ (Seal)
                                -Borrower

_____ (Seal)
                                -Borrower

_____ (Seal)
                                -Borrower

_____ (Seal)
                                -Borrower

[Sign Original Only]

NCNT0023.wp (02-12-02)

Date: 02/03/06

# NO PREPAYMENT CHARGE NOTE ADDENDUM

For value received, the undersigned ("Borrower") agree(s) that the following provisions shall be incorporated into and shall be deemed to amend and supplement the Note made by (the "Borrower) in favor of Option One Mortgage Corporation, a California Corporation

("Lender"), and dated as of even date herewith (the "Note"). To the extent that the provisions of this No Prepayment Charge Note Addendum are inconsistent with the provision of the Note, the provisions of this Addendum shall prevail over and shall supersede any such inconsistent provisions of the Note.

Section 5 of the Note is amended to read in its entirety as follows:

**5.  BORROWER'S RIGHT TO PREPAY**

I have the right to make payments of principal at any time before they are due together with accrued interest. When I make a prepayment, I will tell the Note Holder in writing that I am doing so.

I may make a full prepayment or partial prepayments without paying any prepayment charge. The Note Holder will use all of my prepayments to reduce the amount of principal that I owe under this Note. If I make a partial prepayment, there will be no changes in the due dates of or in the amounts of my monthly payments unless the Note Holder agrees in writing to those changes. My partial prepayment may reduce the amount of my monthly payments after the first Change Date following my partial prepayment. However, any reduction due to my partial prepayment may be offset by an interest rate increase.


_Hossies McDuffie_         _2-3-06_
Borrower HOSSIES  MCDUFFIE         Date

_____         _____
Borrower         Date

_____         _____
Borrower         Date

_____         _____
Borrower         Date

**MULTISTATE NO PREPAYMENT CHARGE NOTE ADDENDUM - ADJUSTABLE**
Page 1 of 1

USRI0221 (11-19-98)

# ASSIGNMENT AND ASSUMPTION AGREEMENT

THIS ASSIGNMENT AND ASSUMPTION AGREEMENT (this "Assignment and Assumption Agreement") is made and delivered as of this 30th day of April, 2008 by and among Option One Mortgage Corporation, a California corporation (the "Company"), each of the other entities listed on the signature page hereto as a seller (the "Selling Subsidiaries" and together with the Company, the "Sellers"), and American Home Mortgage Servicing, Inc., formerly AH Mortgage Acquisition Co., Inc., a Delaware corporation (the "Purchaser", and together with the Sellers, the "Parties").

## RECITALS

1. The Sellers and the Purchaser are parties to a Purchase Agreement, dated March 17, 2008 (the "Purchase Agreement"), providing for the purchase by the Purchaser of the Purchased Assets from the Sellers. Capitalized terms used and not defined herein have the respective meanings given to them in the Purchase Agreement.

2. In connection with such purchase, the Purchase Agreement requires the Purchaser to assume and to be responsible for, pay, perform and discharge as and when due all of the Assumed Liabilities.

3. This Assignment and Assumption Agreement is being executed to evidence and effect the assumption of the Assumed Liabilities by the Purchaser pursuant to the Purchase Agreement.

NOW, THEREFORE, the Parties agree as follows:

1. The Sellers hereby Transfer all of the Assumed Liabilities to the Purchaser.

2. The Purchaser hereby assumes and agrees to pay, perform, be solely liable for and discharge the Assumed Liabilities.

3. This Assignment and Assumption Agreement is not intended to create any broader obligations of the parties hereto than those contemplated in the Purchase Agreement, and in the event of any ambiguity or conflict between the terms hereof and the Purchase Agreement, the terms of the Purchase Agreement shall be governing and controlling. Neither this Assignment and Assumption Agreement nor any term hereof may be changed, waived, discharged or terminated other than by an instrument in writing signed by the Sellers and the Purchaser. This Assignment and Assumption Agreement is subject to all of the representations, warranties, covenants, exclusions and indemnities set forth in the Purchase Agreement, all of which are incorporated herein by reference.

NYI-4069340v5

4. This Assignment and Assumption Agreement shall be governed by, and construed and enforced in accordance with, the laws of the State of New York, without regard to the conflicts of law rules thereof.

5. This Assignment and Assumption Agreement may be signed in any number of counterparts, each of which will be an original, with the same effect as if the signatures thereto and hereto were upon the same instrument. The electronic facsimile transmission of any signed original counterpart of this Assignment and Assumption Agreement will be deemed to be the delivery of an original counterpart of this Assignment and Assumption Agreement.

*[Signature Page Follows]*

NYI-4069340v5

IN WITNESS WHEREOF, the Parties have executed this Assignment and Assumption Agreement as of the day and year first above written.

**PURCHASER**

**AMERICAN HOME MORTGAGE SERVICING, INC.**

By: _____
Name: David M. Friedman
Title: President

**SELLERS**

**OPTION ONE MORTGAGE CORPORATION**

By: _____
Name:
Title:

**FIRST OPTION ASSET MANAGEMENT SERVICES, INC.**

By: _____
Name:
Title:

**FIRST OPTION ASSET MANAGEMENT SERVICES, LLC**

By: _____
Name:
Title:

IN WITNESS WHEREOF, the Parties have executed this Assignment and Assumption Agreement as of the day and year first above written.

**PURCHASER**

**AMERICAN HOME MORTGAGE SERVICING, INC.**

By: _____
    Name:
    Title:

**SELLERS**

**OPTION ONE MORTGAGE CORPORATION**

By: _____
    Name: *Fabiola N. Campori*
    Title: *President*

**FIRST OPTION ASSET MANAGEMENT SERVICES, INC.**

By: _____
    Name: *Fabiola N. Campori*
    Title: *President*

**FIRST OPTION ASSET MANAGEMENT SERVICES, LLC**

By: _____
    Name: *Fabiola N. Campori*
    Title: *President*

**OPTION ONE INSURANCE AGENCY, INC.**

By: _____
Name: Fabiola N. Camperi
Title: President

**OPTION ONE MORTGAGE SERVICES, INC.**

By: _____
Name: Fabiola N. Camperi
Title: President

**PREMIER MORTGAGE SERVICES OF WASHINGTON, INC.**

By: _____
Name: Fabiola N. Camperi
Title: President

**PREMIER PROPERTY TAX SERVICES, LLC**

By: _____
Name: Fabiola N. Camperi
Title: President

**PREMIER TRUST DEED SERVICES, INC.**

By: _____
Name: Fabiola N. Camperi
Title: President

## GENERAL ASSIGNMENT AND BILL OF SALE

THIS GENERAL ASSIGNMENT AND BILL OF SALE (this "Bill of Sale") is made and delivered as of this 30th day of April, 2008 by Option One Mortgage Corporation, a California corporation (the "Company"), and each of the other entities listed on the signature page hereto as a seller (the "Selling Subsidiaries", and together with the Company, the "Sellers"), in favor of American Home Mortgage Servicing, Inc., formerly AH Mortgage Acquisition Co., Inc., a Delaware corporation (the "Purchaser"), and AH Mortgage Servicing India Holdings Inc., a Delaware corporation (the "Purchaser's Designee", and together with the Purchaser and the Sellers, the "Parties").

### RECITALS

1.      The Sellers and the Purchaser are parties to a Purchase Agreement, dated March 17, 2008 (the "Purchase Agreement"), providing for the purchase by the Purchaser of the Purchased Assets from the Sellers. Capitalized terms used herein and not defined herein have the respective meanings given to them in the Purchase Agreement.

2.      This Bill of Sale is being executed to evidence and effect the Transfer of the Purchased Assets to the Purchaser (and, with respect to the Indian Entity Minority Interest, the Purchaser's Designee) in accordance with the terms of the Purchase Agreement.

NOW, THEREFORE, the Parties agree as follows:

1.      *Bill of Sale from the Sellers*. The Sellers hereby irrevocably Transfer to the Purchaser in accordance with the Purchase Agreement, all of the Sellers' rights, title and interest in and to the Purchased Assets (other than the Indian Entity Minority Interest), free and clear of all Liens other than Permitted Liens. The Company hereby irrevocably Transfers to the Purchaser's Designee in accordance with the Purchase Agreement, all of the Company's rights, title and interest in and to the Indian Entity Minority Interest, free and clear of all Liens other than Permitted Liens.

2.      *Excluded Assets*. The Purchased Assets shall not include, and neither the Purchaser nor the Purchaser's Designee shall purchase or acquire or otherwise obtain, any right, title or interest in, to or under, any Excluded Asset.

3.      *Binding Effect*. All such Purchased Assets Transferred pursuant to Section 1 of this Bill of Sale are hereby Transferred, or intended so to be, unto the Purchaser (or, with respect to the Indian Entity Minority Interest, the Purchaser's Designee) and unto their successors and assigns forever, and this Bill of Sale shall be binding on the Sellers and the Sellers' successors and assigns.

4.      *No Waiver or Modification; Subject to Purchase Agreement*. Nothing contained in this Bill of Sale shall be construed as a waiver of or limitation upon any of the

NYI-4069339v5

rights or remedies of the parties hereto as set forth in, or arising in connection with, the Purchase Agreement, or any instrument or document delivered by the parties hereto pursuant to the Purchase Agreement. This Bill of Sale is not intended to create any broader obligations of the parties hereto than those contemplated in the Purchase Agreement, and in the event of any ambiguity or conflict between the terms hereof and the Purchase Agreement, the terms of the Purchase Agreement shall be governing and controlling. Neither this Bill of Sale nor any term hereof may be changed, waived, discharged or terminated other than by an instrument in writing signed by the Sellers and the Purchaser. This Bill of Sale is subject to all of the representations, warranties, covenants, exclusions and indemnities set forth in the Purchase Agreement, all of which are incorporated herein by reference.

5.    *Headings.* The captions and headings herein are included for convenience of reference only and will be ignored in the construction or interpretation hereof.

6.    *Governing Law.* This Bill of Sale shall be governed by, and construed and enforced in accordance with, the laws of the State of New York, without regard to the conflicts of law rules thereof.

7.    *Counterparts.* This Bill of Sale may be signed in any number of counterparts, each of which will be an original, with the same effect as if the signatures thereto and hereto were upon the same instrument. The electronic facsimile transmission of any signed original counterpart of this Bill of Sale will be deemed to be the delivery of an original counterpart of this Bill of Sale.

*[Signature Page Follows]*

NYI-4069339v5

IN WITNESS WHEREOF, the Sellers have executed this Bill of Sale as of the day and year first above written.

**SELLERS**

**OPTION ONE MORTGAGE CORPORATION**

By: _____
    Name: _Fabiola N. Camperi_
    Title: _President_

**FIRST OPTION ASSET MANAGEMENT SERVICES, INC.**

By: _____
    Name: _Fabiola N. Camperi_
    Title: _President_

**FIRST OPTION ASSET MANAGEMENT SERVICES, LLC**

By: _____
    Name: _Fabiola N. Camperi_
    Title: _President_

**OPTION ONE INSURANCE AGENCY, INC.**

By: _____
    Name: _Fabiola N. Camperi_
    Title: _President_

_[Signature Page to General Assignment and Bill of Sale]_

**OPTION ONE MORTGAGE SERVICES, INC.**

By: _____

Name: Fabiola N. Camperi

Title: President


**PREMIER MORTGAGE SERVICES OF WASHINGTON, INC.**

By: _____

Name: Fabiola N. Camperi

Title: President


**PREMIER PROPERTY TAX SERVICES, LLC**

By: _____

Name: Fabiola N. Camperi

Title: President


**PREMIER TRUST DEED SERVICES, INC.**

By: _____

Name: Fabiola N. Camperi

Title: President

Acknowledged by:

**AMERICAN HOME MORTGAGE
SERVICING, INC.**

By: _____
     Name: David M. Friedman
     Title:  President

**AH MORTGAGE SERVICING
INDIA HOLDINGS INC.**

By: _____
     Name: David M. Friedman
     Title:  President

*[Signature Page to General Assignment and Bill of Sale]*



Jordan D. Dorchuck
Executive Vice President & Chief Legal
Officer
American Home Mortgage Servicing, Inc.
4600 Regent Boulevard, Suite 200
Irving, Texas 75063

May 15, 2008

To Whom it May Concern:

**Re:** **Acquisition of the Mortgage Servicing Business of Option One Mortgage Corporation by American Home Mortgage Servicing, Inc.**

Ladies and Gentlemen:

The purpose of this letter is to inform you that, effective as of April 30, 2008, American Home Mortgage Servicing, Inc. ("American Home") completed its acquisition of substantially all of the assets constituting the residential mortgage servicing business of Option One Mortgage Corporation ("Option One"). In connection with this acquisition, American Home:

1.   became the successor servicer or subservicer to Option One under each of the continuing residential mortgage servicing agreements under which Option One previously served as the servicer, subservicer or master servicer;

2.   acquired the ownership of and right to use the "Option One" name and related trademarks in connection with the continued servicing of residential mortgage loans;

3.   hired a substantial majority of the employees of Option One who were engaged in Option One's residential mortgage servicing business;

4.   assumed or subleased facilities of Option One's residential mortgage servicing business in Irvine, California; Jacksonville, Florida; Las Vegas, Nevada; and Pune, India; and

5.   purchased and assumed all other contractual rights and obligations of Option One that primarily relate to its residential mortgage servicing business.

Please direct all future correspondence relating to the residential mortgage servicing business previously operated by Option One to American Home at the address listed above, and feel free to contact Robert Love at 214-260-6804 with any questions you may have about the acquisition.

Thank you for your cooperation.

Sincerely,

Jordan D. Dorchuck
Executive Vice President & Chief Legal Officer
American Home Mortgage Servicing, Inc.

DA1:\520546\01\B5NM01!.DOC\81851.0025